(64 Misc. Rep. 303.)

KAVANAUGH v. COMMONWEALTH TRUST CO. OF NEW YORK et al.

(Supreme Court, Trial Term, Saratoga County. September 2, 1909.)

1. CORPORATIONS (§ 320*) — ACTION BY STOCKHOLDER ON BEHALF OF OTHER STOCKHOLDERS—EVIDENCE.

While an action brought by a stockholder on behalf of the other stockholders to recover funds of the corporation alleged to have been lost through the negligence of the directors is an action in equity, the proof required of the cause of action in favor of the corporation is the same as in an action at law, brought for a like purpose by the corporation.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 320.*]

2. APPEAL AND ERROR (§ 1195*)—LAW OF THE CASE.

The determinations of the Court of Appeals are controlling as to same questions subsequently arising in lower courts in the same case.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4661–4665; Dec. Dig. § 1195.*]

3. BANKS AND BANKING (§ 315*)—TRUST COMPANIES—DISCOUNTS AND LOANS—SUBMISSION TO DIRECTORS—BY-LAWS.

Banking Law (Laws 1892, p. 1909, c. 689) § 156, subd. 2, authorizes a trust company to loan money on real or personal securities. Under subdivision 11, added by Laws 1901, p. 1680, c. 660, it has all the powers and privileges conferred on banks by sections 55 and 56 of the banking law, which powers and privileges were intended to place banks and private and individual bankers on an equality in certain particulars, including interest upon loans on, and discount of, notes, with the national banks. By section 156, subd. 9, it may invest in stocks, bonds, and other securities. Held that, there being a manifest distinction between making investments and making loans and discounts, a by-law of a trust company providing that the executive committee may, in its discretion, authorize the president generally to make investments in such securities as are authorized by the charter of the company, and to dispose of such securities without previously consulting as to details with the committee, did not require all discounts of, and loans on, notes to be first submitted to the board or executive committee.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 315.*]

4. BANKS AND BANKING (§ 314*)—TRUST COMPANIES—REPORT OF LOANS AND INVESTMENTS—DUTY OF EXECUTIVE COMMITTEE.

Where, under the by-laws of a trust company, it was the duty of the executive committee to require all loans and investments to be reported to it at its next meeting for approval, failure of the committee to examine such loans was not excused by the fact that the loans were not presented to the committee; it being its duty to require them to be presented.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

5. BANKS AND BANKING (§ 314*)—TRUST COMPANIES—LIABILITY OF DIRECTORS—LOSSES.

The directors of a trust company, taking vacations without making reasonable provision for meetings of the board or the executive committee, assume the risk of misconduct or mismanagement of the officers, occasioning loss, and if, in the discharge of their duties, they could have prevented

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

or lessened the loss, they cannot escape liability therefor by pleading that they were on their vacations, in accordance with the custom, at the time of year, of directors of trust companies.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

6. BANKS AND BANKING (§ 314*)—TRUST COMPANIES—DIRECTORS—DELEGATION OF DUTIES.

While directors of a trust company may delegate their work, they may not delegate their responsibility, and hence they are not excused from liability for losses suffered by the company because they committed their duties to an executive committee, relying upon it to examine the loans and collateral.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

7. BANKS AND BANKING (§ 314*)—TRUST COMPANIES—LOAN TO DIRECTOR.

A loan by a trust company to a corporation, in which one of the trust company's directors was largely interested, there being no proof that such director as an individual was interested in the loan, did not violate Banking Law (Laws 1892, p. 1908, c. 689) § 156. subd. 11, as added by Laws 1901, p. 1680, c. 660, forbidding a loan to a director, directly or indirectly, without the consent of the majority of the directors.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

8. BANKS AND BANKING (§ 314*)—TRUST COMPANIES—IMPROPER LOANS—LIABILITY OF DIRECTORS.

Directors of a trust company who, had they attended meetings of the executive committee, or board of directors, on a certain day, would have ascertained that certain loans were being improperly made, and could have protected the company against the repetition of such misconduct, were not excused from negligence in allowing losses on similar loans by reason of improper or imprudent acts of executive officers.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

9. BANKS AND BANKING (§ 315*)—TRUST COMPANIES—POWERS—CHARTER—CONSTRUCTION.

A charter of a trust company is a contract between the state and the stockholders, which will be construed strictly, and no powers will be implied.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 315.*]

10. CORPORATIONS (§ 370*)—"ULTRA VIRES" ACTS.

Undertakings of a corporation are ultra vires when they involve adventures beyond the scope of, or the power given, by the charter.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1511–1515; Dec. Dig. § 370.*

For other definitions, see Words and Phrases, vol. 8, pp. 7145, 7146.]

11. BANKS AND BANKING (§ 315*)—TRUST COMPANIES—POWERS—ULTRA VIRES ACTS—LIABILITY.

A trust company issuing a prospectus to encourage the purchase of securities in a venture acts ultra vires; the fact that Banking Law (Laws 1892, p. 1857, c. 689) § 25, contains no provision forbidding such issuance, not warranting a holding that no such restriction exists, and the company is not liable for false statements in such prospectus.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 315.*]

12. BANKS AND BANKING (§ 314*)—TRUST COMPANY—ULTRA VIRES ACTS—LIABILITY OF DIRECTORS.

In such case directors, knowing of the purpose to issue the prospectus, were liable for losses occasioned thereby, whether or not parties borrowing money from the trust company could defend an action on their notes on account of the false statements in the prospectus.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

13. BANKS AND BANKING (§ 314*)—TRUST COMPANIES—LIABILITY OF DIRECT-
ORS.
    A director of a trust company who is necessarily absent on account of
his wife's serious illness is not liable for losses occasioned by the negligent
acts during his absence of other directors.
    [Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

Action by Charles H. Kavanaugh, suing on behalf of himself and
all other stockholders of the Commonwealth Trust Company of New
York, etc., against the Commonwealth Trust Company of New York
and others. Decision and findings directed in accordance with the
opinion.

See, also, 121 App. Div. 903, 106 N. Y. Supp. 1133; 191 N. Y. 522,
84 N. E. 1115.

Edgar T. Brackett and Hiram C. Todd, for plaintiff.
J. Langdon Ward, for defendant Satterlee.
Rush Taggart, for defendant Gould.
Roger S. Baldwin, for defendant Boldt.
Francis S. Hutchins, for defendant Commonwealth Trust Co.
George C. Lay, and Hon. D-Cady Herrick, for defendant Fish.
Sullivan & Cromwell (William J. Curtis and Royall Victor, of coun-
sel), for defendants Brooker, Wetmore, Baldwin, and Snow.
McFarlane, Taylor & Costello, for defendant Crimmins.
Robert D. Murray, for defendant Marvin.
Guggenheimer, Untermyer & Marshall (Louis Marshall, of counsel),
for defendants Belmont and McMahon.

VAN KIRK, J. This action is brought by a stockholder to recover
into the treasury of the Commonwealth Trust Company of New
York, formerly the Trust Company of the Republic, a sum of money
as damages suffered by the trust company; it being claimed that funds
were wasted and lost through the negligence of the defendants, all
of whom are, or were, directors of the said trust company, and some
of whom are, or were, members of the executive committee. The
complaint states a cause of action as was held by the Court of Ap-
peals on a demurrer to the complaint. 191 N. Y. 522, 84 N. E. 1115.
There was no bill of particulars procured or served. The pleadings
in this action have been before the courts, and in the Court of Appeals
(181 N. Y. 123, 73 N. E. 562), Chief Justice Cullen writes as follows:

"The loss of the corporate funds, resulting from the misconduct of the in-
dividual defendants, primarily gave a cause of action to the corporation, not
to its stockholders, and no stockholder could maintain an action for the loss
he had individually suffered in the depreciation of the value of the share of
stock held by him. Niles v. N. Y. Central & H. R. R. R. Co., 176 N. Y. 119,
68 N. E. 142. As said by Judge Vann in Flynn v. Brooklyn City R. R. Co., 158
N. Y. 493, 53 N. E. 520: 'The right of action, however, belongs to the cor-
poration and should be brought by it as plaintiff, but, when it will not bring
the suit itself, an aggrieved stockholder, after due demand and refusal or un-
reasonable neglect to proceed, may bring it in his own name, upon making the
corporation a party defendant.' The action must be brought, not only on be-
half of the plaintiff, but also on behalf of all the other stockholders of the
company, and that is the form of action before us. It is quite plain that the
complaint in such an action should set forth but two things: First, the cause

*For other cases see same topic.& § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of action in favor of the corporation, which should be stated in exactly the same manner and with the same detail of facts as would be proper in case the corporation itself had brought the action; second, the facts which entitle the plaintiff to maintain the action in place of the corporation, that he is a stockholder therein, and that the corporation itself has either refused or unreasonably failed to bring the action. Ordinarily no other allegations are necessary or material. If the corporation were suing its negligent directors, it would be necessary for it to allege and prove what money or assets had been lost or wasted, and the recovery would be for the amount of such loss. * * * In an action brought by a corporation against its directors or officers for misconduct, the necessary proof is exactly of the same character as in an action brought by an individual against its agents, servants, or employés for like misconduct, and the character of the proof is not at all affected by the fact that the action is brought by a shareholder instead of by the corporation itself."

We have here then the direction of the Court of Appeals as to the manner in which this action should be brought and as to the questions involved.

The action prosecuted by a stockholder is an action in equity, but the proof required of the cause of action in favor of the corporation is the same as in an action at law brought for like purpose by the corporation. The right to recover is grounded in negligence. It is claimed that, because the defendants other than the trust company were negligent in performing their duties as directors and disregarded the statute, the funds of the corporation were wasted and great loss suffered by the corporation. The rules which must control in this action in behalf of the corporation are the same as those applicable to the ordinary cause of action in negligence. Such an action is maintainable. Hanna v. Lyon, 179 N. Y. 109, 71 N. E. 778; Hun v. Carey, 82 N. Y. 72, 37 Am. Rep. 546; Brinkerhoff v. Bostwick, 88 N. Y. 52. There are two questions in this branch of the case to be answered: (1) Were the defendants or any of them negligent? (2) Did such negligence cause loss to the corporation? Loss without negligence causing it will not give a cause of action; nor will negligence without resulting loss. Whether or not a director has been negligent depends, under the facts in the case, upon whether or not he has performed his duty and has exercised the required degree of care in the performance of his duty. It is necessary then to know what was the duty of the defendants, directors and members of the executive committee, in connection with the business and property of the corporation, the Trust Company of the Republic. Their duties are defined and regulated in the by-laws, in the provisions of the banking law, and by the relations which exist between the directors and the corporation. The duties, the degree of care required in the performance thereof, and the acts or omissions of the directors of the company having been determined, we shall have all the elements necessary to determine whether or not the defendants or any of them have been negligent.

I have examined many cases in the English courts, the federal courts, and the state courts. The questions, however, that must be passed upon here have been determined in our Court of Appeals, which determinations are not only controlling, but the reasoning and the rules therein contained are satisfactory. In Hun v. Carey, 82 N. Y. 65, 37 Am. Rep. 546, after a careful review of the cases, Judge Earl

has laid down the rules. This case has been repeatedly before our courts and has been uniformly approved and followed; and, if the holdings in this case are to be modified, it must be by the Court of Appeals itself.

In Hun v. Carey, on page 70 of 82 N. Y. (37 Am. Rep. 546), Judge Earl says:

"The relation existing between the corporation and its trustees is mainly that of principal and agent. * * * The trustees are bound to observe the limits placed upon their powers in the charter, and, if they transcend such limits and cause damage, they incur liability. * * * The directors must exercise ordinary care and prudence in the trusts committed to them, the same degree of care and prudence that men prompted by self-interest generally exercise in their own affairs. When one voluntarily takes the position of trustee or director of a corporation, good faith, exact justice, and public policy unite in requiring of him such a degree of care and prudence, and it is a gross breach of duty, crassa negligentia, not to bestow them."

And again, quoting from Scott v. De Peyster, 1 Edw. Ch. 513, Judge Earl says:

"I think the question in all such cases should and must necessarily be whether they (directors) have omitted that care which men of common prudence take of their own concerns. To require more would be adopting too rigid a rule and rendering them liable for slight neglect, while to require less would be relaxing too much the obligation which binds them to vigilance and attention in regard to the interests of those confided to their care, and expose them to liability for gross neglect only, which is very little short of fraud itself."

On page 73 of 82 N. Y. (37 Am. Rep. 546) Judge Earl dissents from the proposition that directors are not liable for mistakes of judgment, even though they may be so gross as to appear to us to be absurd and ridiculous provided they are honest, and says:

"Like a mandatary, to whom he has been likened, he is bound not only to exercise proper care and diligence, but ordinary skill and judgment. As he is bound to exercise ordinary skill and judgment, he cannot set up that he did not possess them. When damage is caused by his want of judgment, he cannot excuse himself by alleging his gross ignorance. * * * They (the directors) undertook, not only that they would discharge their duties with proper care, but that they would exercise the ordinary skill and judgment requisite for the discharge of their delicate trust."

In Hanna v. Lyon, 179 N. Y. 110, 71 N. E. 779, Chief Judge Parker says:

"The law is settled in this state that directors of monetary corporations are held to the same degree of care that men of ordinary prudence exercise in regard to their own affairs."

The rules, therefore, that are to guide in the decision of this action seem to be plain.

We are now prepared to consider the duties of the directors, the degree of care exercised by them, and the facts of the case as disclosed by the evidence. The organization certificate of the Trust Company of the Republic was made under the banking law of the state of New York, being chapter 689, p. 1842, Laws 1892, as amended, was duly acknowledged, and the certificate of authorization was issued by F. D. Kilburn, superintendent, March 26, 1902. The provision of the

banking law (section 156, subd. 11, added to Laws 1892, p. 1908, c. 689, by Laws 1901, p. 1680, c. 660), contains this:

"No loan exceeding one-tenth of its capital stock shall be made by any such corporation (directly or indirectly) to any director or officer thereof, and such loan to such director or officer shall not be made without the consent of a majority of the directors."

Section 161 (Laws 1892, p. 1912, c. 689, as amended by Laws 1896, p. 412, c. 452, § 3), contains this:

"The affairs of every such corporation shall be managed and its corporate powers exercised by a board of directors. * * * Each director when appointed or elected shall take an oath that he will so far as the duty devolves on him diligently and honestly administer the affairs of such corporation and will not knowingly violate or willingly permit to be violated any of the provisions of law applicable to such corporation."

Early in the history of the corporation, and before any of the acts complained of had been committed, the stockholders of the Trust Company adopted the by-laws. These by-laws constituted a set of rules binding upon the stockholders, upon the directors, and the executive committee; and each of the defendants, when he qualified as director, agreed to perform his duties under those by-laws as well as under the provisions of the banking law.

Article 1, § 1, provides:

"The affairs of the company shall be managed, and its corporate powers exercised by a board of twenty-five directors, organized and continued in accordance with the provisions of section 161 of the banking law. * * *"

Article 8, § 1:

"There shall be an executive committee consisting of the president and six other directors to be elected by the board, and three present, if the president be one of them, and a majority of the committee, if the president be absent, shall form a quorum for the transaction of business. * * *"

Section 2:

"The executive committee shall exercise all the powers of the board of directors, when the board is not in session, except the power to fill a vacancy in the board."

Section 4:

"The executive committee shall meet at the main office of the company on Tuesday in every week at such time as it may appoint. It shall also meet on the call of the president."

Section 5:

"Regular minutes of the proceedings of the executive committee shall be kept and shall always be open to the inspection of any director; and the minutes of the meeting of the preceding month shall be read at each monthly meeting of the board."

Article 9, § 1:

"There shall be a regular meeting of the board of directors at the main office of the company on the third Tuesday in every month at 3:30 p. m., or at such hour as the board may from time to time appoint, to which a report shall be made by the president of the finances, affairs and business of the company."

Article 11, § 1:

"All money of the company, or under its charge, shall be deposited only in a bank or banks, selected by the executive committee, to the credit of the company, in its corporate name."

Section 2:

"At each meeting of the board of directors, the order of business shall be as follows:

"1st. Reading and correction of minutes. 2nd. Reading of minutes of executive committee."

If the directors disregarded these rules and regulations or negligently allowed them to be disregarded, and loss was thereby suffered by the Trust Company, the defendants were negligent and liable for the loss so suffered. Hun v. Carey, 82 N. Y. 70, 37 Am. Rep. 546. I do not think that article 8, § 2, of the by-laws, requires that all discounts of, and loans on, notes shall be first submitted to the board or the executive committee. This paragraph, providing for investments of funds in stocks, personal securities, and bonds and mortgages, refers rather to placing the funds in some kind of a security to provide an income for some period of time. There is a manifest distinction between making investments and making loans and discounts. By section 156, subd. 2, of the banking law, a trust company may loan money on real or personal securities, and under subdivision 11 it exercises all the powers and possesses all the privileges conferred on banks by sections 55 and 56 of the banking law. These powers and privileges were intended, as stated in section 55, "to place and continue banks and private and individual bankers on an equality in the particulars herein referred to" (interest upon loans on, and discount of, notes) "with the national banks organized under the act of Congress." By subdivision 9 of section 156 of the same law it may invest in stocks, bills of exchange, bonds, mortgages, and other securities. Article 8, § 2, of the by-laws, refers to investments as distinguished from loans. The matters under investigation in this case come under the head of loans on collateral rather than investments.

Article 8, § 3, of the by-laws, provides that no disbursements except for current expenses or for an amount not to exceed $200 shall be made without being reported to the executive committee for approval. The last sentence of Article 8, § 2, is as follows:

"The executive committee may in its discretion authorize the president generally to make investments in such securities as are authorized by the charter of the company, and to dispose of such securities without previously consulting as to details with the committee; but all such transactions shall be reported to the committee at its next meeting."

And in the minutes of the meeting of the executive committee on May 27, 1902, it appears that the executive committee directed the secretary to present to the committee at their meeting a complete list of all loans and collaterals not previously passed upon by the committee. In all well-regulated institutions it is the custom and duty of the board of directors to know of the loans of the bank or trust company. The loans are not made by the directors; but, under the by-laws and as the agents of the corporation, the directors were under the duty to examine the statement of the condition of the trust com-

pany on that day and the loans that had been made and the collaterals given therewith since the last previous meeting.

I conclude, therefore, that it was recognized on May 27, 1902, under the by-laws, as well as the custom in New York City, that it was the duty of the executive committee to require all loans and investments to be reported to it at its next meeting for approval, unless it be those call or Wall street loans which by custom were often outstanding but one day; and it was the duty of the executive committee to have known of each of the loans in question at the next meeting after the loan was made, and of the directors generally to have known at the next meeting of the board. It is not a sufficient excuse to reply that the loans were not presented to the executive committee. It was the duty of that committee to require them to be presented. The directors and the members of the executive committee have active duties and responsibilities. Their duty is not lessened, nor is their responsibility discharged, by reason of the fact that they are informed there will be no regular meeting. Their duties are not entirely limited to regular meetings. They may perform duties outside of the regular meetings; and each director and a member of the executive committee, if he has cause to understand that there is necessity for action by himself, may act. Cassidy v. Uhlmann, 170 N. Y. 521, 63 N. E. 554. Where the duty of knowing exists, ignorance due to negligence of duty creates the same liability as actual knowledge and failure to act thereon. Where trusted officers cause loss, the directors who trusted them, and therefore neglected to exercise the care a reasonably prudent man would exercise in his own affairs, cannot escape liability, if such care would have avoided or lessened the loss. It is not a full performance of duty to employ competent officers who are believed to be reliable. The directors have other and additional duties. They have the supervision and management of the trust company, and are to do those things the by-laws require of them. They are to obey the banking law, and are to exercise reasonable diligence to do those things incident to the proper management of the trust company. When they became directors, they accepted the obligation to so act. What else does their oath, required by statute, mean? The directors are not spies upon the officers, nor are they expert bookkeepers. Regular semi-annual or quarterly examinations of the affairs of the trust company by special committees are made because prudence and experience have shown them to be wise acts and not the acts of detectives or spies. The same is true of the work to be done at meetings of the board of directors and of the executive committee. It is the work of prudence, and is to inform the directors so that they may have knowledge on which to act. It cannot be required that the executive committee or the directors should make at each meeting the same complete examination of the trust company and its affairs as is made on the quarterly examinations—for example, that they should personally examine and handle the notes and the collateral—but they should learn the amount of each note, the time it is due, the names of the makers and indorsers, and the collateral held, as these facts exist upon the day of the meeting, also a full statement of the condition of the bank on each day is kept by every monetary institution. This statement does not contain the

full details; but, unless the accounts are falsified, it will not require an expert bookkeeper to know that something is wrong, if any considerable loan or item is omitted from the statement.

When directors have chosen officers of a trust company in whom they thoroughly rely, if they see fit then to intrust the business to those officers, it is their personal trust, and not the trust of the company itself or of the stockholders, and the true position is this: That, if the director sees fit to abandon his position and to rely upon the officer, either during vacation time or at any other time, he says, in effect, I trust him, and I assume the responsibility of his acts without performing my duties of supervision as the law and by-laws require me to do, and I must be held accountable for the acts of the officer to the same extent as if I were present and performing my duties and consenting to his acts. Under the facts in this particular case, I am not much impressed by the contention that a director is not negligent if he performs his duty as directors of other institutions of the same kind in the city or community performed theirs; that is, as the custom prevails. A man cannot believe he may neglect his duty or do a wrongful act because other men to his knowledge have the habit. There are circumstances to which this rule may be applied, but it cannot lessen responsibility for failure to obey a provision of the statute or the by-laws of a corporation or a recognized duty.

It is urged that custom permits directors to take vacations; that prudent men take vacations and commit their personal business affairs to employés; that, if losses occur on account of the acts of officers while a director is on vacation, he cannot be charged with negligence. It is true that the prudent man takes his vacation; but, when he does, he realizes that he is turning his business over to his employé. He takes the risk of mismanagement or misconduct while he is gone, knowing that such losses as he suffers thereby he must bear. He trusts his employé and goes. He does not pretend that, during his absence, he is performing his duty to his business. He is exercising faith rather than performance. He thinks he is doing his duty by himself; that he has earned, and his continued good health requires, a vacation. While on vacation he is not giving that care to his business which the prudent man ordinarily gives. It is not a question whether a prudent man takes a vacation. He does. But, while away, does he take care of his business at all? The directors are intrusted with duties. There is no understanding that they are to do their duty excepting during vacation time. No such exception is contained in the required oath. If they take vacations without making reasonable provision for meetings of the board or the executive committee, they assume the risk of misconduct or mismanagement of the officers, which occasions loss, just as the business man assumes the risk of the misconduct of his employé; and, if they, in the discharge of their duties, could have prevented or lessened the loss, they cannot escape liability for that loss by pleading that they were on their vacations, as it was the custom for directors of trust companies to be at this time of year. A director may be excused by the board for a period of time and escape all liability; for then, through his associate directors, he has made reasonable provision for the management of the company's affairs during his

absence. It is true that a director need not give all his time and attention to his duties as a director. He is presumed to have other business. But it is still his duty to give reasonable attention to the affairs of the trust company. Does this position involve the proposition that every director, though absent, is responsible for the acts of those present, unless he is excused? Is every director to be treated as responsible as if present at every meeting? The answer to those questions must depend upon the facts of each case. If a man is unavoidably detained from a meeting, as for example, by very pressing business, not vacation or convenience, or by sickness or other necessity, he could hardly be charged with negligence for failure to be present and there perform his duties. The members of the board or of the executive committee should attend at the appointed time for a meeting. A member, it is true, cannot pass a valid resolution, but he can require and gain all the information that could be had were a quorum present; nor is a member excused because the president informs him there will be no quorum. The members of the board or of the executive committee cannot abdicate their duties because there will be no quorum or because of convenient vacations, and turn the trust company over to the executive officers, without assuming and incurring liability for the wrongful and imprudent acts of officers causing loss, which they would have prevented if they had attended to their duties. We must not overlook the fact that the duties of the officers and of the directors are entirely distinct. The executive officers are the officers and agents of the Trust Company, and not of the directors, and the officers are not to be expected to perform the duties of directors. Directors, not members of the executive committee, are not excused from liability because they committed their duties to the executive committee and relied upon them to examine the loans and collateral. The stockholders elected the directors, not the executive committee; and, if the directors saw fit to rely on the executive committee, it was their own reliance and their own risk. They may delegate the work, not their responsibility. We believe the above propositions are applicable to and cover generally the facts in this case.

Before taking up the particular items on which loss is claimed, a clearer understanding will be had of the conduct of the directors from a brief general statement of the history of the trust company and its connection with the shipbuilding enterprise. The Trust Company of the Republic was organized in March, 1902, and began business March 31, 1902, the directors qualifying in March and early April. At various times beginning in May, 1902, Mr. Dresser made reports to the directors concerning the shipbuilding project and the interest which the Trust Company should take therein. After these statements and the published advertisements in the name of the Trust Company, it was understood by all the directors that the Trust Company of the Republic was taking an active part in the shipbuilding matter, that it would issue the prospectus, among other things, and that through it the bonds of the shipbuilding company should be sold. John W. Young was the promoter of the shipbuilding combination, and had the options upon the properties which were to go into the combination. These options expired on August 11 and 12, 1902. The moneys

to take over these options were expected to be furnished from three underwritings of $3,000,000 par value of bonds each, one in New York, one in London, and one in Paris. The underwriting in New York was fully subscribed. The underwriting in London was abandoned; and thereafter $1,750,000 additional underwriting was secured in New York. Promises, apparently justified, were constantly made that the Paris underwriting would be carried out and the funds sent on. On the 11th and 12th of August, however, the proceeds of the Paris underwriting had not been received, and there were not sufficient funds to take over the property. On those days loans were made to Lewis Nixon to the amount of about $2,622,000, and other loans made and obligations contracted by the Trust Company, in connection with the raising of the fund to take over the options; the result being that within a comparatively few days the funds of the Trust Company of the Republic, including deposits, were loaned for the purposes of the shipbuilding enterprise to the extent of nearly $5,000,000. So that a trust company, which was organized in March, 1902, was in August, 1902, depending entirely upon the success of the shipbuilding enterprise for its solvency. Undoubtedly, when these large loans were made in August, it was confidently expected that the French underwriting would be very soon realized upon and the cash furnished to reimburse largely for these loans. The hopes of the Trust Company and its directors in this respect were never realized. When the directors understood the extent to which the affairs of the Trust Company were involved in the shipbuilding enterprise, some of the directors, among them Messrs. Satterlee, Wetmore, Fish, and Boldt, made very great efforts, for which they are to be commended, to organize a syndicate for taking over the shipbuilding bonds and relieving the Trust Company of the enormous loans and obligations in connection therewith. As a result the Sheldon Syndicate was organized, which agreed to underwrite $5,500,000 par value of the shipbuilding bonds at 75, and, by the terms of the agreement, the syndicate were to have 15 months; that is, until January 29, 1904, to dispose of the bonds or furnish the cash. As a result of this syndicate operation, $4,125,000 were paid into the Trust Company, and the large loans to Nixon and other obligations, which the Trust Company took upon itself in August and early September, 1902, were paid. Therefore, whether these transactions were wrongful or not, it is not necessary to consider them. The claim against the defendants must be considered in relation only to those items, in consequence of which a loss was suffered by the Trust Company.

None of the defendants knew at the time of any of the transactions which caused loss to the Trust Company. So, if any defendant was negligent, it was not in doing the negligent act itself, but in failing to know about, and prevent, it. It will be assumed that no one of the defendants would have done knowingly a wrongful act. So that the question presented is: Ought he to have known? Was he negligent in failing to know? Was he warned and put on his guard by anything he knew or ought to have known? If in the performance of his duties, with the care and attention an ordinarily prudent man, actuated by self-interest, would have given to his own business affairs, he would have learned of the wrongful acts in time to have prevented them or

lessened the loss, or to have prevented a subsequent similar loss, then he was negligent in failing to know them. These defendants must be judged in the light of their conduct and their known duties. When, if at all, was there an act of which the defendants would have known if they had discharged their duty, which should have put them on their guard? No negligence appears in the choice of the executive officers, in the by-laws adopted, or in the naming an executive committee which should meet once a week. This latter was not to relieve the board of its duties. It was rather to provide a more constant attention to duties. Nor was it unlawful or imprudent to undertake the shipbuilding matter, except in one particular hereinafter discussed.

The first item concerning which a loss is claimed is a loan to the Narragansett Webbing Company, April 30, 1902, $50,000, on which there was ultimately a loss of $25,000. It is claimed that this is in violation of the banking law (section 156, subd. 11); Dresser having been largely interested in the Narragansett Webbing Company, a corporation, at the time; and this provision of the banking law forbidding a loan to a director, directly or indirectly, without the consent of a majority of the board of directors. There is no proof that Dresser as an individual was interested in this loan. It was not a loan directly or indirectly to Dresser, and therefore it was not an illegal or improper loan.

The next matter questioned is the account headed "Advances." In this account were entered transactions in the stock of the Trust Company, but on the face of the account this fact does not appear. The account is innocent on its face, and the directors are not required to be expert bookkeepers. The transactions were of very brief duration, and no loss was suffered thereby.

Nor does it impress me that the loans made to John W. Young, June 23d, $700, June 24th, $5,000, July 12th, $2,500, if known to the directors, would have been a warning that the assets of the company were being improperly or carelessly handled. In the light of subsequent events, one might say that these loans were carelessly made. In the light of the events as they stood at the time, in which light we must view the transaction, the court cannot so hold. On June 26, 1902, a loan was made to Charles E. Reiss for $50,000, and on July 21st another loan of like amount to Reiss (these loans having been later changed to A. H. Engle) with shipbuilding bonds as collateral. Charles E. Reiss was a partner of Dresser in the firm of Dresser & Co., and at that time Reiss was considered to be of considerable financial responsibility. On July 24, 1902, a loan was made to J. G. White & Co., for $37,500, with shipbuilding bonds as collateral, and on August 1st another loan with like collateral for $33,750. J. G. White & Co. were contractors of high standing and good financial responsibility. On July 25, 1902, a loan was made to E. G. Bruckman of $90,000, with like collateral. Mr. Bruckman was a man of large business interests and financial responsibility, of St. Louis, Mo.

We would not be justified in holding that the defendants as directors or members of the executive committee were negligent because they did not realize that in making these loans the funds of the Trust Company were being improperly used or put in jeopardy of being wasted.

But the loan of $30,000 to Dresser, without consent of the directors, July 24, 1902, was in defiance of the banking law (section 156, subd. 11). There was no loss. This loan should have been known at the next meeting of the executive committee and of the directors. It seems to me, however, that it would be too strict to hold that this single error (Dresser then being supposed to be financially responsible) put the directors on inquiry and on guard.

On August 11th and 12th the options held upon the properties to go into the shipbuilding combination expired, and upon these two days the loans to Lewis Nixon and others in very large amounts were made. These were improper and reckless loans. They had as collateral the bonds of the shipbuilding company to a larger amount than the Trust Company ought to have accepted, and some of the loans were of a much larger amount than they had any right to loan to any one person. None of the directors, as above stated, knew of these loans at the time; but, under the rule of duty adopted by the court as applicable to this case, it was the duty of the defendants, members of the executive committee, at the time the next regular meeting of the executive committee was appointed to be held, to have attended and examined the statement of loans, so that within one week after August 12th the existence of these loans should have been known to such defendants. At the next regular meeting of the board of directors after August 12th (namely, on the third Tuesday, August 19th), if the directors had attended at the time and place of the meeting and performed their duties, they would have learned of these loans, and from that time on such defendants had warning and were put upon their guard to protect themselves and the Trust Company against a repetition of such conduct, and the loans that were thereafter made upon shipbuilding bonds as collateral were made under conditions such that any director should have known, considering the affairs of the shipbuilding company as they then were, that it was reckless and careless and negligent to take any further loans upon the same collateral. No prudent man managing his own affairs would have done so. To do so would not be exercising ordinary skill and judgment. The collateral was at the time speculative and untried. From August 19th the executive officers should have been under restraint and instructions, if allowed to remain in office.

On September 4th defendant Fish gained knowledge of the fact that guarantees of loans in the National Park bank were made, or promised to be made by the Trust Company of the Republic, to insure the National Park bank against loss. At the meeting of the executive committee on September 9th, when this matter came up, Mr. Wetmore says that it was discussed, but that he refused to give his consent that the Trust Company should give such guaranty. Whether or not the resolution was passed authorizing the guaranty is not so material; but the fact does exist that at that time Mr. Wetmore had positive information that the executive officers of the Trust Company of the Republic had promised guarantees to be made by the Trust Company of the Republic to other financial institutions to secure loans made to other parties than the Trust Company of the Republic; and consequently he and Mr. Fish were then further put upon inquiry as to the conduct

of the president of the Trust Company. These defendants who failed to attend the meetings of the executive committee or the board of directors on or about August 19, 1902, unless detained of necessity, cannot be excused from negligence in allowing such losses as occurred after the 19th of August by reason of improper or imprudent acts of the executive officers.

I therefore allow as damages the items of loss on the loans made upon shipbuilding bonds collateral after August 19, 1902, because already the Trust Company had larger loans upon such collateral than it was prudent or proper that it should accept.

Against each of these losses must be allowed as an offset the value of the collateral which was received by the Trust Company in connection with the loss. There was no time prior to the expiration of the Sheldon Syndicate agreement when the Trust Company of the Republic could have disposed of the bonds. The Sheldon Syndicate operation I consider very commendable and prudent; and, under the terms of that agreement, the Trust Company was not at liberty to dispose of the bonds until its expiration at the end of January, 1904. This action was begun in August, 1904; and, although it is an equity action, being brought by a stockholder to enforce a cause of action in favor of the Trust Company, yet that cause of action in favor of the Trust Company which the stockholder plaintiff is prosecuting is strictly an action at law, and, under all the circumstances of the case, I have concluded to calculate the value of the preferred and common stock of the Bethlehem Steel Company, which under the reorganization has been taken in place of the shipbuilding bonds, as of August 1, 1904, about the time the action was begun. If the prices of this stock were taken as of the day of the trial or the day of the decision, there would very likely be considerable fluctuations in the value of the stock before the matter was finally adjusted, and if the value is calculated as of August 1, 1904, then those directors who are held liable for and pay the items of loss must be given the right upon payment of the value of the security on August 1, 1904, which is the amount charged against the Trust Company as an offset, to take over the corresponding preferred and common stock, and enjoy whatever increase in value that stock had had in reduction of their losses. At whatever price the value of the stock was calculated justice would require that the defendants be given this privilege. At the present value of the stock, the offset would not wipe out the damages, and consequently there can be no prejudice to the defendants if the value of the stock is calculated as of August 1st. The evidence shows that the preferred stock was upon August 1st quoted at $41 per share for the preferred and $7 per share for the common. The amount of loss as to each item therefore will be calculated as follows: Compute the interest on the amount of the loss to August 1, 1904; deduct from the principal and interest of the loss the value of the stock as of August 1, 1904; from this balance deduct the proportionate share of the $71,925.56, which the loss bears to the total loss suffered by the Trust Company of the Republic by reason of the shipbuilding transactions—then calculate the interest upon the last balance to the day the findings and decision are made.

Damages are allowed for the loss upon the Bruckman and J. G.

White & Co. loans, whether before or after August 19th, because the Trust Company of the Republic had no authority to issue a prospectus, making statements to induce purchases of bonds, on account of which statements a purchaser might claim damages because the statement was false.   The Trust Company has those powers only that are conferred upon it by its charter and the banking law of the state of New York, and are strictly limited to the exercise of such powers in such manner and by such agents as its charter and the law permits.   Its charter is a contract between the state and the stockholders, which will be construed strictly, and no powers will be implied.   Nassau Bank v. Jones, 95 N. Y. 115, 47 Am. Rep. 14.   Corporations are artificial creations.   Trust companies are organized with restrictions and provisions intended to secure the institution and its stockholders against loss.   Speculative undertakings, entered into by a trust company, subject to hazard and contingency of gain or loss, are ultra vires, and a perversion of the powers conferred by its charter.   Undertakings are ultra vires when they involve adventures or undertakings outside and not within the scope of, or the power given by, their charters.   The acts under which they are organized were framed in view of the rights of the public and the interests of the stockholders.   Jemison v. Citizens' Savings Bank of Jefferson, Tex., 122 N. Y. 135, 140, 141, 25 N. E. 264, 9 L. R. A. 709, 19 Am. St. Rep. 482.

The uniform tendency of the decisions is to so construe the powers and privileges of corporations organized under our banking law as to preserve their security and solvency, to avoid losses, and to avoid liability from doubtful or speculative undertakings.   Unsound banking and speculative or liability incurring methods in moneyed corporations are to be disapproved.   When this Trust Company undertook to issue a prospectus, setting forth the facts and conditions concerning the properties to be brought into the shipbuilding combination, to induce purchases of bonds, which, in turn, involved the Trust Company and its stockholders in a liability for damages in case false statements were contained in their prospectus, it acted beyond its authority.   I can find no provision of the banking law which apparently authorizes a trust company to do such thing and to incur such liability.   The Trust Company, when putting forth the prospectus, was acting, not only ultra vires, but against public policy.   95 N. Y. 120, 121.   If the Trust Company had no authority to issue such prospectus, it could not become liable for false statements therein.   95 N. Y. 118, 47 Am. Rep. 14.   And, if not liable for false statements therein, then the directors were not justified in releasing Bruckman and J. G. White & Co. from their notes.   In this view of the case, therefore, the directors would be liable for the loss occasioned by the loans to Bruckman and J. G. White & Co.   Also, if the Trust Company was not authorized to issue the prospectus and loss was occasioned thereby, the directors are liable for that loss, whether or not Bruckman or J. G. White & Co. could defend an action on the note on account of the false statements in the prospectus.   All of the directors knew of the purpose to issue the prospectus.   Under our banking law, as it existed in 1902, trust companies were provided for in article 4,

including sections 150 to 163, inclusive. The powers of the corpora-
tion are set forth in section 156. The first paragraph reads as follows:

"Upon the filing of any such certificate of authorization of a trust company,
the persons named therein and their successors shall thereupon and thereby
become a corporation; and, in addition to the powers conferred by the general
and stock corporation laws, which provisions have no bearing upon the ques-
tion here."

A careful reading of each one of the subdivisions of section 156
shows that no one of the powers there conferred covers the act here
under discussion. That a trust company should act as a house of issue,
and thus become in effect a promoter of an enterprise, is entirely for-.
eign to the powers intended to be conferred by this provision of the
statute. The restrictions placed upon the trust company are contained
in section 25 of the banking law, and apply as well to any corporation
organized under the banking law. The fact that in section 25 there is
no provision forbidding a trust company to issue a prospectus to en-
courage the purchase of securities does not furnish basis for holding
that no such restriction exists. The trust company has no powers,
except such as are conferred upon it by the banking law and its char-
ter. The restrictions in section 25 are to be applied in connection with
doing those things which the trust company has authority to do. The
conclusion, therefore, which must be reached, is that the directors are
liable for losses incurred upon the Bruckman and the J. G. White &
Co. loans.

I have also allowed the loss incurred in connection with the loan
to Dresser made in November, 1902, with 19 bonds as collateral. This
transaction is referred to in the minutes of the executive committee
of November 12, 1902, and in the resolution of January 27, 1903. A
loan to Dresser at this time with bonds as collateral was an imprudent
and negligent act. The loss will be calculated upon this item as upon
the other items against which bonds as collateral were held, and such
balance as is found will bear interest from August 1, 1904. In an ac-
count spoken of as "Advances Account" I allow as damages the loan
to Dresser September 25, 1902, $35,000, which bears interest from its
date. Each one of the items of loss, as calculated as of August 1,
1904, is to be reduced by its proportionate share of said $71,925.56.

The papers spoken of as interim certificates were issued by the
Trust Company of the Republic upon orders of Mr. Young, the
promoter. When the options were taken up, the bonds to the amount
of $16,000,000 were delivered to Mr. Young. Nine million dollars of
these bonds were reserved for the underwritings in London, Paris,
and New York. One million five hundred thousand dollars of the
bonds were reserved for working capital, leaving $5,500,000 of bonds
undisposed of. While in Paris, Mr. Young gave orders by which cer-
tain of these bonds were to be issued to certain individuals in con-
nection with the Paris underwriting or in connection with subscrip-
tions for bonds. When the orders for such bonds were sent to New
York, the bonds had not yet been executed and issued, but the Trust
Company of the Republic issued the interim certificates, each calling
for certain amounts of the said bonds. The bonds represented by these
interim certificates and concerning which disputes have arisen are the
bonds (now exchanged for stock) held in escrow by the Trust Company

of the Republic. These securities, as I understand it, did not go into the hands of the Trust Company in connection with any of the transactions or loans upon which losses are charged in this action against the defendants, and therefore are not proper offsets to any liability which may be found against the defendants or any of them.

The motions made on behalf of defendants Fish and Boldt for leave to amend their answers so that they may deny that a proper demand had been made upon the Trust Company to bring this action, and that such demand was refused are denied. Also the motions to dismiss the complaint on behalf of some of the defendants on the ground that the demand was not sufficient to justify the action against such defendants are denied. I think that the demand was sufficient, that the naming of the individuals who should be sued may be considered as surplusage, and that a demand that an action be brought to recover upon the grounds stated in the demand, without naming the parties who should be sued, would have been sufficient. After a demand was made that such an action be brought, the Trust Company could have prosecuted one or more of the defendants as it saw fit. I am also of the opinion that the demand made and the refusal was sufficient to justify the court in upholding the plaintiff's right to maintain this action. The plaintiff has been a holder of stock in the corporation since the time preceding any one of the items of loss charged as damages against the defendants.

Under the rule above stated, Mr. Boldt, on account of his necessary absence from the meetings, his absence having been occasioned by the serious illness of Mrs. Boldt, until October 10, 1902, is not liable for any of the items of loss dated after July 1st and prior to October 10, 1902. This relieves him from liability on the loans of October 2 and 4, 1902, and the Dresser loan of September 25, 1902, but does not relieve him from liability on the White & Co. and Bruckman loans, as based on the unauthorized issue of the prospectus. Defendant Fish returned from his business engagements in the West on the 14th of August, and was not absent thereafter on account of business. Brooker was frequently in the city during the entire period in question.

None of the defendants had informed their associate directors that they were to be absent for any period of time, and none of them made any reasonable provisions for the other directors to care for the business of this company during their absence. None of the defendants, therefore, except the defendant Boldt, as above specified, have shown a necessity for their absence from meetings, nor are any of them to be excused from liability on account of absence from necessity, or because they had made reasonable provision for the discharge of their duties by the other directors. No director is liable for any loss which was suffered by reason of a transaction made after his resignation as director.

The sums paid to the firm of attorneys, Ward, Hayden & Satterlee, were properly and legally paid. The law firm is a different entity from the defendant, the director Satterlee, and the firm was retained formally as counsel by the board of directors. The firm is entitled to its reasonable fees, and there is no claim that the moneys paid the firm were in excess of reasonable fees for the services rendered.

A decision and findings will be made accordingly.