### KAVANAUGH v. GOULD et al.

(Supreme Court, Appellate Division, Third Department. November 15, 1911.)

1. BANKS AND BANKING (§ 314*)—DIRECTORS' LIABILITY TO STOCKHOLDERS— EXECUTIVE COMMITTEE OF DIRECTORS.

The directors of a trust company have the general superintendence and active management of all its concerns. Each director sustains a distinct relation not only to it, but to its stockholders. The board may delegate some of its power to committees selected from the board; but said delegation of authority does not relieve directors generally of all responsibility, and, if information comes to them of irregularity in the affairs of the company, they are bound to take steps to correct those irregularities, and to use every effort that a prudent business man would use in supervising his own affairs, with the right to rely on the vigilance of the executive committee to ascertain any irregularity in its management.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. BANKS AND BANKING (§ 314*)—OFFICERS—DIRECTORS WITH DIVIDED INTERESTS.

　　One who has other large business connections and whose interests are so divided that he has no time to attend to or watch the detail management of a banking institution is not the less eligible to the directorate of such institution.

　　[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

3. BANKS AND BANKING (§ 314*)—DIRECTORS—DUTIES AND LIABILITIES OF EXECUTIVE COMMITTEE.

　　Members of an executive committee of a trust company are bound to be on their guard to detect any irregularities or improvident acts on the part of the executive officers, and to scan critically the detailed reports which are made to them by such officers, and their diligence is therefore greater and the rule of their liability more strict than that of a director not a member of that committee.

　　[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

4. BANKS AND BANKING (§ 314*)—OFFICERS—EXECUTIVE COMMITTEE OF DIRECTORS—DIVISION OF RESPONSIBILITY—KNOWLEDGE OF DIRECTORS.

　　The by-laws of a trust company provided for an executive committee composed of six directors, in addition to the president, to exercise all the powers of the board of directors when it was not in session, whose assent was required for all investments of the company's funds in stocks, personal securities, and bonds, and for the disposal thereof, who had discretion to authorize the president generally to invest in securities authorized by the charter and to dispose of such securities without previous information to the committee, but that no special disbursement should be made without report to such committee for approval, and such committee was to meet weekly and keep minutes of its proceedings. Banking Law (Consol. Laws 1909, c. 2) § 42, provides that directors should designate an officer to prepare and submit to each director at each regular meeting "or to an executive committee of not less than five members of such board" a written statement of all loans, the collateral thereon, etc. Held, that the directors might divide their duties and responsibilities, and that directors not members of the executive committee were not chargeable with knowledge of detail management reported only to the executive committee nor liable for the negligence of the members of that committee.

　　[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

5. BANKS AND BANKING (§ 314*)—DIRECTORS—LIABILITY FOR LOSS THROUGH THEIR OWN NEGLIGENCE.

　　Directors of a trust company are liable only for losses caused by or attributable to their own negligence.

　　[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

6. BANKS AND BANKING (§ 314*)—DIRECTORS—LIABILITY TO STOCKHOLDERS.

　　The executive committee of a trust company, acting as fiscal agent of a shipbuilding company and receiving subscriptions for its bonds, loaned money on the personal notes of parties financially responsible on the security of assignments of right, under underwriting agreements, to bonds to be issued by the shipbuilding company, which agreements contained the provision that they were to be void unless the whole amount of bonds was underwritten, and such money was placed to the credit of the shipbuilding company with the trust company until the full amount should be raised. Such bonds then had a ready sale in the market. Held, that it could not be held to be an act of negligence upon the part of any director of the trust company to sanction the loan of money, under the circumstances.

　　[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

7. BANKS AND BANKING (§ 315*)—OFFICERS—STATUTORY PROVISIONS—ISSU-
ANCE OF PROSPECTUS.

Under Laws 1892, c. 689, § 156, subds. 1 and 9, which empowers trust
companies to act as fiscal or transfer agents of any corporation, and in
such capacity to register certificates of stocks and bonds and to purchase,
invest in, and sell stocks, bonds, and other securities, a trust company,
as a corollary to its right to sell bonds, has the right to publish a pro-
spectus descriptive of the bonds offered for sale.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 315.*]

8. BANKS AND BANKING (§ 314*)—DIRECTORS—PERSONAL LIABILITY FOR LOANS
MADE.

The officers of a trust company invested a large sum in its own stocks.
This did not appear on the books of the company or the reports to the
executive committee formed from the board of directors, except so much
charged to "advances." Nothing was in fact lost by such use of the
trust company's money. There was also a further loan appearing on
the books of $800,000 to one firm which was in excess of the amount that
might lawfully be loaned to that firm, and there were other loans made
inadequately secured. The trust company thereafter loaned the sum of
$2,600,000 on the notes of the president of the company and another se-
cured by the bonds of a shipbuilding company, of which the trust com-
pany was the financial agent, and the company in a short time became
obligated to the amount of $4,100,000 on security of these bonds. The
board of directors thereafter procured a syndicate to take these bonds
from the company and pay the notes, so that no loss came to the trust
company by reason of these unauthorized acts. At the time the trust com-
pany had loaned upwards of $5,000,000 at the par value of these bonds.
*Held*, that the trust company could not well refuse thereafter to take
these bonds as collateral for money loaned, and thus discredit them, in-
asmuch as it would have been impossible therefore to have formed a
syndicate for the payment of the sum of $4,100,000, for which amount
the president had unlawfully involved the trust company, so that loans
thereafter made of smaller sums on the security of these shipbuilding
bonds were not negligently authorized by the board of directors, and
though the irregularities on the part of the president were sufficient to
put the directors on guard against further irregularities on his part,
and though they would be liable for losses arising from similar irregu-
larities, they could not be held liable for the smaller loans made at a
time when the bonds were not discredited and when the borrowers were
men of acknowledged financial responsibility.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

9. BANKS AND BANKING (§ 314*)—OFFICERS—DUMMY DIRECTORS—LIABILITY
TO STOCKHOLDERS.

A director of a trust company consented to serve as such on an under-
standing with the company's president that he should not be called upon
to attend any of the meetings of the board, but would simply allow the
use of his name in the directorate, the making of which agreement was
beyond the authority of the president. *Held*, in an action by a stock-
holder seeking to recover for losses alleged to be due to the negligence of
the directors, that such director's liability was to be determined as if
no such agreement had been made, and that, as a director, he was
charged, neither actually nor constructively, with knowledge of the making
of loans or of the collateral upon which they were made by the execu-
tive committee and might rely upon the acknowledged financial respon-
sibility of the parties to whom the loans were made, and that for any
loss not attributable to his own negligence he was not liable.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**10.** BANKS AND BANKING (§ 314*)—OFFICERS—LIABILITY OF DIRECTORS—MEMBER OF EXECUTIVE COMMITTEE—UNAUTHORIZED APPROPRIATION BY PRESIDENT OF COMPANY.

The by-laws of a trust company provided that with the president two of the five members of the executive committee should constitute a quorum. A member of the executive committee, prior to going abroad, in July, suggested a mode of filling the vacancy upon that committee in his absence, and members of the executive committee sufficient in number to constitute a quorum were at all times during his absence within reach of the president, and on his return in October learned that in his absence the president of the company had made unauthorized loans of money, taking as collateral the bonds of a shipbuilding company of which the trust company was fiscal agent, and thereupon he organized a syndicate which took over such bonds and canceled the liability of the trust company. *Held* that, without fault in taking his vacation, he could not be held to have been guilty of any negligence making him liable for loss upon loans to responsible parties made upon the same security during his absence.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

**11.** BANKS AND BANKING (§ 314*)—DIRECTOR'S LIABILITY TO A STOCKHOLDER—MISAPPROPRIATION BY PRESIDENT.

The president of a trust company engaged in receiving subscriptions for bonds of a shipbuilding company, to be issued according to underwriting agreements, withdrew from the company the sum of $35,000 without security or authority and without the knowledge either of the executive committee or the board of directors, and during a two months' absence the misappropriation was discovered, and after his return defendant, a member of the executive committee, both advised suit against the president and sought to compel his resignation. *Held*, that such director, and another director who had resigned before the president's return and before suit could be brought, was not liable to a stockholder of the company for any negligence respecting the president's misappropriation.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 314.*]

Kellogg, J., dissenting.

Appeal from Trial Term, Saratoga County.

Action by Charles H. Kavanaugh, who sued on behalf of himself and all other stockholders of the Commonwealth Trust Company of New York (formerly the Trust Company of the Republic) who are situated similarly with himself, against George J. Gould and Herbert L. Satterlee, impleaded with others, in which Trust Company Association of the State of New York intervened. From a judgment for plaintiffs, defendants Gould and Satterlee appeal. Reversed, and new trial granted.

The plaintiff has brought this action in behalf of himself and other stockholders of the Republic Trust Company against certain of the directors of said Trust Company to compel said directors to restore to the company moneys claimed to have been lost through their negligence. The action is brought upon the allegation of a neglect and refusal of the Trust Company itself to sue.

Early in 1902 the Trust Company of the Republic was incorporated. Both the defendant Gould and Satterlee soon after its incorporation were elected and qualified as directors. Satterlee became a member of the executive committee. Upon July 24th said Trust Company loaned to J. G. White & Co., upon their promissory note, the sum of $37,500. This note was secured by an assignment of rights under an underwriting agreement in bonds to be issued by the United States Shipbuilding Company to the amount of $32,000. On July 25th said Trust Company loaned to E. G. Bruckman the sum of $90,-

000, upon his individual note, secured by an interest in a similar underwriting agreement, in bonds of the Shipbuilding Company to the amount of $113,-400. Upon August 1st said Trust Company loaned to J. G. White & Co. $33,-750, upon their promissory note, secured by their interest in a similar underwriting agreement, for bonds of the said Shipbuilding Company, to the amount of $50,000. Upon August 29th said Trust Company loaned to J. G. White & Co. $28,500, upon bonds of said Shipbuilding Company, of the par value of $38,000. Upon October 2d said Trust Company loaned to Wheeler & Jones $12,000, and upon October 4th to W. A. Bailey the sum of $12,000. These loans were upon the promissory notes of the respective parties, secured by bonds of the said Shipbuilding Company of the par value of $33,600. Upon December 23d said Trust Company loaned to J. G. White & Co. $34,200 upon their promissory note, secured by bonds of the said Shipbuilding Company of the par value of $40,000. Upon January 6, 1903, said Trust Company loaned to W. A. Bailey the sum of $21,600 and to Wheeler & Jones the sum of $21,-800, upon their promissory notes, respectively, secured by bonds of the said Shipbuilding Company of the par value of $60,400. For the losses incurred upon these loans, as well as for a loss incurred by reason of $35,000 paid to the president, Dresser, upon September 25, 1902, the judgment against the defendant Satterlee is based. Inasmuch, however, as the defendant Gould resigned as director upon October 29, 1902, he has not been held liable for the loss upon the notes that were thereafter executed.

It was proposed by men interested in the United States Shipbuilding Company to purchase the principal ship yards in various parts of the country. The financial scheme of this Shipbuilding Company was to execute a first mortgage for $16,000,000 as security for bonds of $1,000 aggregating an equal amount. Of these bonds $5,500,000 were to be withdrawn from public issue for disposal under vendors' and subscribers' contracts; $1,500,000 thereof were to be reserved in the treasury of the company; and the balance, or $9,000,000 thereof, bearing interest at 5 per cent., were to be offered for public subscription, and the proceeds used to pay for the several plants to be acquired. The $9,000,000 issue of bonds was to be offered for public subscription at not less than 95 per cent., and the Trust Company of the Republic was authorized to receive application for these bonds at that price. The prospectus issued by this Shipbuilding Company named the Trust Company as bankers and transfer agents; while the Mercantile Trust Company was named as the trustee for the bondholders. The Bethlehem Steel Company was not one of the concerns which it was first proposed to purchase and make part of the Shipbuilding Company, and was not mentioned in the prospectus. Thereafter, however, arrangements were made for its purchase and consolidation. Upon August 11th and 12th these properties were passed over to the Shipbuilding Company upon payment of the several sums named in the options which had been theretofore held. Prior to this time, however, many of the bonds had been provided for by various underwriting agreements, and all of these notes upon which loss occurred were notes for moneys to pay upon or complete those underwriting agreements. The moneys were not handed over to the several makers of the notes, but were passed to the account of the United States Shipbuilding Company upon the books of the Republic Trust Company. It had been theretofore agreed upon that the Republic Trust Company should hold the deposits and be the fiscal agent of the United States Shipbuilding Company. This Shipbuilding Company progressed until some time in the latter part of 1903, when it became embarrassed, and a reorganization was had and stock and bonds of the Bethlehem Steel Company were substituted upon these loans for these Shipbuilding bonds. Some time after January 26, 1903, all of the makers of these notes were released from personal liability by the Republic Trust Company. The collateral upon the notes proved of little value, and the Republic Trust Company lost upwards of $300,-000 thereupon, and this in the main forms the basis of the judgment against these defendants. The judgment as entered runs against other defendants who are not represented upon this appeal. Further facts appear in the opinion.

Argued before SMITH, P. J., and KELLOGG, SEWELL, HOUGHTON, and BETTS, JJ.

Rush Taggart, for appellant Gould.

J. Langdon Ward (Lewis E. Carr, of counsel), for appellant Satterlee.

Alton B. Parker, for intervener.

Edgar T. Brackett, for respondent.

SMITH, P. J. [1] In Cassidy v. Uhlmann, 170 N. Y. 505, 63 N. E. 554, the opinion in part reads:

"The board of directors of a bank has the general superintendence and active management of all its concerns, and, for all practical purposes, the board is the corporation. As a general rule a board of directors must act as a board. But, since directors do not exercise a delegated authority in the sense which applies to other officers and agents, it is clear that a board of directors may delegate some of its powers to committees and individuals selected from the board. This is common practice in the management of banks as well as other corporations. Since a board of directors is composed of individuals, it is manifest that each director sustains a distinct relation, not only to his bank, but to its stockholders and depositors. For obvious reasons the duties which attach to this relation cannot be previously defined. They cannot be the same under all circumstances; nor can they be imposed with unvarying exactness upon all directors alike."

By the evidence of the plaintiff's witness Krech, it appears to be the custom of banks in New York City to intrust to the executive committee of the board the supervision of the detail management of the corporation. The directors generally not upon the executive committee are not supposed to have knowledge of the details of the business management of the corporation which are not submitted to them. In other words, it is not their custom to actively search the individual transactions in a bank that they may learn the responsibility of its debtors, or the nature or value of the collateral. This they intrust, first, to the executive officers of the bank, who are carefully chosen and paid for their services; secondly, to the supervision of the executive committee of their body, which is chosen with a special reference to this duty, and to which committee must be reported weekly all the transactions of the bank.

This custom, however, does not relieve directors generally of all responsibility. If the by-laws require monthly meetings, they must make diligent effort to be present thereat. They must give their best efforts to advance the interest of the corporation, both by advice and counsel and by active work on behalf of the corporation when such work may be assigned to them. If at their meetings, or otherwise, information should come to them of irregularity in the proceedings of the bank, they are bound to take steps to correct those irregularities. The law has no place for dummy directors. They are bound generally to use every effort that a prudent business man would use in supervising his own affairs, with the right, however, ordinarily to rely upon the vigilance of the executive committee to ascertain and report any irregularity or improvident acts in its management. And

this custom is but the outgrowth of the necessities of the situation. In the first place, it is not a practical proposition to commit the supervision of the details to 25 men. A smaller number would do the work more efficiently. Responsibility would be greater because not so scattered. Again, business men of New York are probably the busiest men in the world. They have large business enterprises in which their first interest lies and to which their first duty belongs. Most of them are directors of more than one corporation, and some of them of many. If they are compelled to supervise the detail management of each corporation in which they are directors, or if they are deemed to have constructive knowledge of such facts as would be acquired by such supervision, it would be wholly impossible for them to accept such a trust. [2] They cannot give the time to watch the small everyday transactions of the corporation, and if chargeable with such knowledge as would be acquired therefrom the risk is too great for them to run. They are then in effect made answerable for the neglect of the executive committee to which is given this duty of supervision. Plaintiff's contention is that they must not then accept the position of director. The obvious answer to this contention is that *the corporation cannot afford to lose them.* One of the best assets of a corporation is the advice and assistance of men of business experience and of *large business connections* upon its board. Their advice and assistance is of inestimable value in all emergencies and in determining the policies of the corporations and in counsel upon the more important questions that arise. Any construction of the law that would make it impossible for such men to accept positions upon various boards of directors would seriously impair both the effectiveness and stability of corporations, in fact be little less than calamitous.

[3] But plaintiff contends further that this rule of responsibility leaves the stockholder at the mercy of the executive officers of the corporation. Not at all. To the members of the executive committee is assigned the duty of detail supervision. With this duty they are bound to be on their guard to·detect any irregularities or improvident acts on the part of the executive officers. They are required to scan critically the detailed reports which are made to them by such officers. The diligence required of them is therefore greater and the rule of their liability more strict than that of a director not a member of that committee, for to them not only do the stockholders look for protection, but the directors themselves, and upon their fidelity to their commission all parties must rely. Moreover, twice each year an expert examination is made of the condition of the Trust Company, and of its results all directors must take cognizance. Plaintiff's assertion that the directors may delegate to the executive committee their work but not their responsibility is not in accord with the law of this state. If they may delegate the work, they are not responsible for its negligent performance, and this principle is not new to the law of trust. It is ruled in New York state that a trustee is not liable for the breach of trust of his cotrustee of which he was not cognizant, or in which he did not participate, as to property which comes lawfully into his cotrustee's hands. He may passively allow his

co-trustee to take full control and yet not be liable for his devastavit. The responsibility is more strictly held in England and in Pennsylvania. In 1 Perry on Trusts (6th Ed.) page 667, note A, it is said:

"In the administration and management of the affairs of a trust it is usually impracticable for every trustee to actually participate in every act. To some extent they may delegate to each other the merely ministerial duties of management, and each is entitled to rely upon the honesty and prudence of the other unless he has notice of facts which should lead him to distrust the other."

In Croft v. Williams, 88 N. Y. 388, the opinion in part reads:

"One, therefore, may sit passive and see the other receive funds of the estate, and making no objection be deemed to assent, but that does not make him responsible for what has been received. He must in some manner know and assent to the misapplication, he must be a consenting party to the waste, or neglect some duty consequent upon his knowledge of a misapplication intended or in progress. Williams v. Nixon, 2 Beav. 472. A wrong done or a duty omitted must lie at the foundation of his liability."

In Sutherland v. Brush, 7 Johns. Ch. 22, 11 Am. Dec. 383, I quote from the opinion:

"The defendant P. is not responsible for the devastavit of his coexecutor C., any further than he is shown to have been knowing and assenting, at the time, to such devastavit or misapplication of the assets of the estate. Both the executors could not, with any kind of convenience, jointly possess and hold all the assets. The assets must, from the necessity and reason of the case, have been distributed between the executors, for the purpose of collection and security; and it appears to be settled, and upon very just principles, that one executor shall not be chargeable with the waste of the other, except so far as he concurred therein; and that merely permitting the other to possess the assets, without going further, and concurring in the application of them, does not render him answerable for the receipts of the other."

This rule is further held in Cocks et al. v. Haviland, 124 N. Y. 431, 26 N. E. 976; Wilmerding v. McKesson, 103 N. Y. 340, 8 N. E. 665; Ormiston v. Olcott, 84 N. Y. 346.

[4] While these cases are not precisely analogous to the case at bar, they establish the rule that among trustees there may be a division of duties arising out of the necessities of the case, and after that division one trustee is not responsible without knowledge for the acts of his cotrustee. As applied to the case at bar, as far as these directors are trustees for these stockholders, a division may be made both of duty and responsibility, and the directors generally are not liable for the negligence of the members of the executive committee, as they would in effect so be if they were chargeable with all the knowledge which might be imputable to a member of the executive committee, by reason of his supervision of the detail management of the corporation.

This distinction between the diligence required of a director generally and a member of the executive committee is not only shown by the evidence in the case to be the custom in banks in the city of New York, not only does it appear to be a reasonable and sane distinction, but it is clearly recognized in the by-laws of this corporation itself, which were made by these very stockholders here complaining, and afterwards ratified by the board of directors. In fact, these

stockholders might make any requirement that they should see fit in their by-laws regulating the duties of the directors, which would be binding upon the directors, and are not subject to modification or veto by the directors themselves. Those by-laws provide for the executive committee to be composed of six members of the board of directors in addition to the president. To that executive committee is given all the powers of the board of directors when the board is not in session, except the power to fill a vacancy in the board. The assent of that executive committee is required "for all investments that shall be made of the funds of the company in stocks, personal securities and bonds and mortgages; and for the disposal of the same and of the funds of all special trusts." No guardianship, receivership, or other special trust can be accepted by the president without either their approbation or that of the board of directors, unless it be ordered by a court or surrogate having jurisdiction. The executive committee may in its discretion authorize the president generally to make investments in such securities as are authorized by the charter of the company, and to dispose of such securities, without previously consulting as to details with the committee; but all such transactions shall be reported to the committee at its next meeting. No disbursements, except for current expenses or for an amount not to exceed $200, shall be made without being reported to the executive committee for approval. The executive committee is required to meet at the main office of the company on Tuesday of each week, and also meet at other times on the call of the president. Section 5 requires:

"That regular minutes of the proceedings of the executive committee shall be kept, and shall always be open to the inspection of any director; and the minutes of the meeting of the preceding month shall be read at each monthly meeting of the board."

All through the by-laws is clear evidence of a specific supervision given to the executive committee, of which the directors generally are relieved. In accordance with those provisions reports were made weekly to the executive committee of loans proposed and loans made. While the by-laws required that the minutes of the meeting of the executive committee should be before the board of directors, those minutes need not necessarily show specific loans proposed or loans made. There is nothing in the by-laws which would require the executive committee or any officer of the Trust Company to report to the directors any of the detail of its business management. These by-laws, therefore, recognize clearly a difference between the supervision to be assumed by members of the executive committee and members of the board of directors generally.

Finally this principle has received legislative recognition. By chapter 155 of the Laws of 1908, section 42 of the Banking Law (Consol. Laws 1909, c. 2) was made to read in substance:

"That by resolution duly recorded in the minutes of the proceedings the directors should designate an officer whose duty it should be to prepare and submit to each director or trustee at each regular meeting of the board, *or to an executive committee of not less than five members of such board,* a written

statement of all purchases and sales of securities, and of every discount and loan, exclusive of discounts and loans of less than one thousand dollars, made since the last regular meeting of the board, describing the collateral to the loans so made as of the date of the meeting at which such statement is submitted."

This statement is required to contain other details also. But the significance of the provision is that the directors may by resolution provide that this detailed information should, instead of being given to the board itself, be given to an executive committee of not less than five members. The necessary inference follows that the directors not upon the executive committee are not chargeable with knowledge of detail management which need be reported only to the executive committee. So that the distinction which I have sought to deduce from reason and judicial authority is now made part of our statutory law.

[5] Before discussing the facts as bearing upon the liability of the respective defendants, it may be well to call attention to a general rule of law which is here applicable. That rule of law charges a party guilty of negligence only with the loss caused by that negligence. Whatever punishment there may be aside from civil liability must rest in the criminal law. The liability of these defendants for the losses with which they have been charged can only be sustained if such losses were caused by their negligence. In Bloom v. National Savings Bank & Loan Co., 81 Hun, 120–127, 30 N. Y. Supp. 700, it is held that directors are liable only for loss of its funds attributable to their negligence. To this is cited Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924, 35 L. Ed. 662; Arthur v. Griswold, 55 N. Y. 400. The Bloom Case is affirmed in the Court of Appeals at 152 N. Y. 115, 46 N. E. 166. It is unnecessary to cite further authority, as this proposition is distinctly asserted both in the opinion of the Trial Term and in the brief of respondent's counsel, so that it stands here unquestioned.

[6] The makers upon the notes, for loss upon which these defendants have been charged, were all of them abundantly responsible financially. The Shipbuilding bonds which were offered as collateral were being readily sold in New York, and purchased by the leading financiers of the city at prices which made them apparently abundant security for the notes for which they were collateral. The moneys loaned upon these notes were all passed directly to the credit of the Shipbuilding Company upon the Trust Company's books, and went to strengthen and make secure the very bonds that were held as collateral. These underwriting agreements all of them contained the provision that they were to be void unless the $9,000,000 contemplated to be sold was entirely underwritten. So that if there should be any failure to procure the $8,100,000, which was contemplated to be procured upon the same of this $9,000,000 of bonds, the moneys would be in the vaults of the Trust Company subject to the claim of the Trust Company thereupon as a first equity. These moneys were, therefore, all retained by the Trust Company itself until the full amount should be raised, the various properties purchased and the bonds made of substantial worth. With the responsibility of the makers of the notes conceded, and with the value of the bonds attested by

repeated purchases by leading financiers in New York City, it cannot be held to be an act of negligence upon the part of any director to sanction the loan of the moneys under the circumstances and in the way in which it was thus loaned.  Nor could the plaintiff himself or anybody question the act of the directors in sanctioning such a loan, except for facts which afterwards developed, of which the directors had no knowledge at the time that the loans were made, and of which they could not by active diligence have obtained knowledge.  It seems that in the early part of 1903 Bruckman and White and the other makers of these notes claimed in some way that they had been misled in the making of these underwriting agreements, and demanded that they be released from personal liability upon these notes.  The learned trial judge has found that their claim was that they were misled by false representations in a prospectus which was issued by the Trust Company upon the sale of these bonds.  This finding is not supported by the evidence.  There is no evidence anywhere in the case which shows that their claim was based upon any misrepresentations in the prospectus.  The inference of the trial justice is wholly unjustified. The evidence is not clear as to just what was the nature of their claim.  The only light thrown upon the nature of that claim lies in the agreement for the release of Bruckman, wherein it is recited:

"Whereas, said Bruckman agreed to underwrite and purchase said securities subject to a loan of $149,200 with interest at five per cent. per annum, for the payment of which loan he was not to become personally liable, the said Trust Company looking to the securities only for eventual payment."

This paper between the Trust Company and Bruckman, executed upon January 27, 1903, would seem to indicate that he and the others had been promised immunity from personal liability by Dresser, or some one in his behalf, which promise was wholly unknown to Satterlee or to any other director at the time the loans were made.  Satterlee in fact swears that these loans prior to October would have been provided for by the Sheldon Syndicate agreement, which will be hereafter referred to, if it were not for the known responsibility of the makers of the notes.  The fact that these notes were not provided for by the Sheldon Syndicate is full corroboration of Sheldon's attitude that he supposed the makers were individually liable thereupon.  The trial court has found that these makers were negligently released.  If so, the release was by directors subsequent to the resignation of both Gould and Satterlee, and the negligence was not their negligence. But without further evidence as to the ground of the release or the foundation therefor, it cannot be held that the release was itself a negligent act.  Wetmore swears that the Trust Company thought it impolitic to have a suit with such a determined man as Bruckman was known to be.  There might have been many reasons from a policy standpoint why the Trust Company did not wish to have litigation at that time in respect of those underwriting agreements.

But assume for the argument that the trial judge was right in finding that the contention of the makers of these notes was that they were misled by statements in this prospectus.  There is no proof in the case that there was any misstatement of fact in that prospectus,

or anything upon which a claim of fraudulent representation could be made. The trial judge has not found that there was any fraudulent or false statement therein. It was not claimed upon the trial by the plaintiff's attorney, for when the question arose the court stated upon the trial:

"There is no claim of fraud here in the prospectus; no recovery asked because of fraud in the prospectus."

This statement was unchallenged by the plaintiff's counsel. But the trial court has held these defendants liable upon all the White and Bruckman notes, not because of any fraud in the prospectus, but on the ground that the act of publishing the prospectus was an act ultra vires, which gave an opportunity for the makers of the notes to claim fraud and thereby cause this loss. It is not entirely clear how the conclusion follows the premises in this syllogism. [7] But it is immaterial, because in my judgment the premises are inaccurate. Section 156 of the Banking Law (chapter 689 of 1892) purports to define the powers of this company. In the first subdivision of the section it is given power "to act as fiscal or transfer agent of any state, municipality, body politic or corporation, in such capacity to receive and disburse money and transfer, register and countersign certificates of stock, bonds and other evidences of indebtedness." By subdivision 9 it is given power "to purchase, invest in and sell stocks, bills of exchange, bonds and mortgages and other securities." The power thus given would seem to be comprehensive enough to authorize this Trust Company as the fiscal agent of the Shipbuilding Company to sell its bonds, and with the authority to sell the bonds there must follow as a corollary thereto the right to advertise the bonds for sale. If so, the ground upon which the trial judge has based the defendants' liability for the first three notes at least cannot sustain the conclusion which he has reached.

[8] As to the loans that were made upon these notes after the 12th of August, another and a different ground of liability is also asserted. Early after the organization of this corporation the officers of the corporation were in the habit of buying and selling in the name of the corporation its own stock. At one time $160,000 was invested by the Trust Company in its own stock. That did not appear upon the books of the company or any of the reports to the executive committee except as so much charged to "advances." With the duty, however, of the executive committee to supervise the detail of the corporation, such a large charge to an indefinite account called "advances" would in my judgment put them upon inquiry, so that they were deemed to have known of this transaction. It is not claimed that anything was lost by this speculation. In fact, it resulted in a profit of upwards of $2,000 to the company. But it is claimed that there was such irregularity as should put the directors upon their guard as to possible future irregularity of the officers of the company. There was a further loan appearing upon the books in June of $800,000 to one firm, which was in excess of the amount that might lawfully be loaned to that firm. Further, there were loans made to one John W. Young, which were perhaps inadequately secured by collateral. But

the main irregularity which has been held to charge all of these directors with a specific duty occurred upon the 11th and 12th of August, or thereabouts. At that time the options given to the Shipbuilding Company upon these various properties were about to expire. Of the $9,000,000 of bonds which were to be sold, it was understood that $3,000,000 were to be underwritten in London, $3,000,000 in Paris, and $3,000,000 in New York. The London and the Paris underwritings fell through, so that when it come to the 11th and 12th of August the Shipbuilding Company did not have the money with which to complete options which it held. Thereupon the Republic Trust Company loaned to Lewis Nixon and Dresser the sum of $2,600,000 upon their notes, secured by Shipbuilding bonds. It also procured other banks to loan to these same parties further sums, so that within a short time the Republic Trust Company had either loaned or obligated itself to the amount of about $4,100,000, substantially upon the security of these Shipbuilding bonds alone. This was held by the trial judge to be such an improvident, reckless act of the president of the Trust Company as to give notice to all of the directors of his improper conduct of the bank, and further to give notice to them to provide that no further loans should be made upon the security of Shipbuilding bonds. It cannot be questioned that the act of Dresser in loaning this large sum to himself and Nixon, and in obligating the Trust Company for a further sum, was wholly unauthorized and improvident. I will agree for the argument that this act of Dresser gave warning to all of the directors not only that steps must be taken to repair the injury done to the bank, but also that steps must be taken to provide against any further such unauthorized acts by the officers. The board of directors, however, under Satterlee's leadership, procured a syndicate, called the "Sheldon Syndicate," to take these bonds from the company and pay the notes of Nixon and Dresser, and pay the guaranty made by the Trust Company. So that confessedly no loss came to the Trust Company by reason of these unauthorized and improvident acts upon the 11th and 12th of August. I am not prepared, however, to assent to the proposition that the directors were thus warned that they must loan no more funds upon the security of these bonds. They at that time had loans secured by upwards of $5,000,000, at the par value of these bonds. They could not afford to refuse to take these bonds as collateral for money loaned *on these very underwriting agreements* and thus discredit those bonds. If they had done so at that time, it would have been impossible to have formed this syndicate for the payment of this $4,100,000, in which amount Dresser had unlawfully involved the Trust Company. So that the loans of August 29th to White & Co. of $28,000, of October 2d to Wheeler & Jones of $12,000, and of October 4th to W. A. Bailey of $12,000, all upon the security of these Shipbuilding bonds, cannot be said to have been negligently authorized by the board of directors, if in law they had been, under the peculiar circumstances in which they were placed. It must be borne in mind further that these bonds had not at that time been discredited in the financial market, and that the makers of these notes were all of them of known financial responsibility. This Sheldon Syndicate

agreement, which provided for the payment of the unauthorized liability assumed by Dresser upon August 11th and 12th, was perfected upon October 29th. George R. Sheldon, the head of that syndicate, was one of the leading financiers in New York City. Other members of the syndicate were representative bankers and business men in New York City. They took these bonds at a valuation of 75 per cent., with the agreement that they would divide with the Trust Company whatever profits were made thereupon. They then went into the market and sold these bonds, so that a profit of over $160,000 was made thereupon, of which the Trust Company had its half. Instead of discrediting these bonds, therefore, upon the market, the stability of their values had been practically for the time demonstrated by these very sales, and after that time the loans made to White, Bailey, and Wheeler & Jones in December, 1902, and January, 1903, were made both upon acknowledged financial responsibility of the makers and upon the established market value of these bonds. We may assent to the proposition that these irregularities on the part of Dresser were sufficient to put these directors on guard against further irregularities upon his part, and that for losses which thereafter occurred, if they arose from similar irregularities, they would clearly be liable. *The difficulty with plaintiff's proposition is that the losses which did thereafter occur arose from no irregularities on the part of the officers of the company whatever.* From this statement must be excepted an item of $35,000, which will be discussed hereafter. The promise of personal immunity, if given by Dresser, occurred at the inception of these underwriting agreements, before the directors were put upon their guard, and none of the directors had an intimation thereof until 1903, when it was asserted as a defense to those notes. Upon the making of this Sheldon Syndicate agreement upon the 30th day of October, 1902, the defendant Gould resigned as director. The defendant Satterlee urged Dresser to resign as president, but Dresser was upheld by the defendant Boldt and other defendants, so that he did not resign and was re-elected in January for another term. Upon his re-election the defendant Satterlee resigned from the board, having resigned from the executive committee upon December 23d previous.

[9] As to defendant Gould, then, he consented to go upon the board upon an understanding with Dresser that he should not be called upon to attend any of the meetings of the board, but would simply allow the use of his name in the directorate. This agreement was clearly beyond the authority of Dresser to make. The stockholders had a right to assume that as director he would comply with the obligations of his oath and accept and discharge the responsibilities of the position. Such an agreement could only be made with the stockholders themselves, and even then it is not certain that such an agreement would be effective as against a liability claimed in behalf of creditors. In the case at bar it does not appear that there are any creditors whose rights are involved. Gould's liability therefore must be determined as if no such agreement had been made, and he is clearly liable provided that the losses with which he has been charged are attributable to his failure to perform the duties which the law imposes upon a

director not a member of the executive committee. The contention that, because he has wholly neglected his duties as director, he has made the executive officers of the bank his representatives and is responsible for all of their acts, ignores the well-settled rule of law that a negligent director is liable only for the losses attributable to his negligence. If I am right in the conclusions which I have heretofore reached, as a director generally he was charged neither actually nor constructively with the knowledge of the making of any of these loans or of the collateral upon which they were made. But further than that, if he had been attentive as a director, attending every meeting of the board of directors and had specifically authorized these very loans upon these securities, such acts under the circumstances would not have been negligent acts which would make him responsible for the losses arising therefrom. Neither actually nor constructively did he have notice of any secret agreement for personal immunity made between the makers of the notes and Dresser. So that he might rely upon the acknowledged financial standing of the makers of these notes. And, as has been before indicated, these bonds had a stable and substantial value in the New York market. Looking backward with the knowledge of subsequent events, we might say that such investments were unwise. In view of the situation as it then existed, at the most it can only be said that there was an error of judgment, and to hold directors liable for losses under such circumstances would make them insurers of the acts of the executive officers of the bank. Liability to this extent is nowhere claimed even by the plaintiff.

[10] As to the defendant Satterlee still other questions arise. He was a member of the executive committee, and was one of the firm of Ward, Hayden & Satterlee, who were the attorneys for the Trust Company. Upon July 16th he went to Europe upon his vacation, and did not return until the 30th day of September. I have heretofore considered his liability as though he had been present at all these times and had full knowledge of all the acts of Dresser and the Republic Trust Company. The trial court has found that he had no right to take this vacation except with the permission of the board of directors, and with a provision for some one's taking his place. The by-laws provided that with the president two members of the executive committee should constitute a quorum. Greig was a director upon the executive committee and was one of the officers of the company and at all times accessible. Prior to leaving Satterlee suggested that one Wetmore, a neighbor of Dresser's at Oyster Bay, should be asked to fill a vacancy that existed upon that committee, apparently that he might be there during his absence. Either Wetmore or Marvin were at all times present in or near the city of New York, and at all times subject to call in case Dresser wanted a meeting of the executive committee. Whether or not they were negligent in not going to the Trust Company's building and insisting upon a meeting of that executive committee is not a matter of concern here. Satterlee was not negligent in taking a vacation while there were members of the executive committee sufficient to constitute a quorum at all times during the summer within reach. One of the members of his firm was at all

131 N.Y.S.—68

times in the city during his absence. Of course, Satterlee occupied an unusual position with this corporation. He was one of the organizers of the company. He was not only a member of the executive com- mittee, but he was one of the attorneys for the company, and probably was the main stay of its president while he was in the city. The ex- ecutive committee meeting usually consisted of Satterlee, Greig, and Dresser. But, even so, he had the right to assume that sufficient of the executive committee remaining in the city would attend to make up the quorum, and that the president would see to it that such com- mittee meetings were held. At that time he could not be charged with notice of any such emergency as afterwards arose in respect of the underwriting of the Shipbuilding bonds. When he left it was sup- posed that at least the French underwriting could be relied upon. Positive assurances were given thereof up to within two or three days of the time that the options had to be completed. The company had refused to underwrite any of these bonds. No loans had been made upon their security, which were in any way indiscreet or hazardous as far as he could know. He returned from Europe upon the 30th of September. Early in October he found out what had transpired in his absence. He thereupon went actively to work to form a syndi- cate which would relieve the Trust Company of the embarrassment in which it had been put by Dresser's improvident acts. The forma- tion of this syndicate has been approved by the trial court, and the plaintiff's counsel in his brief finds no fault with the actions of Sat- terlee after he returned from his vacation. After the redemption of these bonds and the canceling of these liabilities by the Sheldon Syn- dicate, the bank examiner reported to the State Banking Department that the capital and surplus of the institution were left intact and a small profit shown in addition. It would seem, therefore, that he had been thoroughly diligent, both before his vacation and after his re- turn therefrom, and without fault in taking that vacation he cannot be held to have been guilty of any negligence which could have caused this loss to the company.

[11] There is one other item of liability found as against both of these defendants which is not included in these notes. Shortly after the 25th day of September, Dresser went to Europe and did not re- turn until some time in November. Upon the 25th day of September he withdrew from the Trust Company the sum of $35,000. This was taken without security. It is spoken of as loan to Dresser by the trial judge; but, if it was a loan to Dresser, it was a loan by Dresser to himself. It was not submitted to the executive committee, and no knowledge thereof was given to any member either of the executive committee or of the board of directors. In Scott v. Depeyster, 1 Edw. Ch. 541, the court, in discussing an act of embezzlement of the secretary and treasurer of the company and the liability of the direc- tors therefor, used the following language:

"If this be so, then no blame can attach to the president or any of the di- rectors in respect to the mere act of embezzlement or the commission of for- gery in altering checks. The funds were not needlessly or improperly ex- posed by them to the temptation of such crimes. They had a right to re- pose some confidence in the secretary of the company. His station required

it of them; at least, so far as to allow him to receive whatever money was paid at their office in the course of business and have charge of such money for the purpose of depositing it in bank, and also to the extent of filling up checks to be signed by the president and himself and to be used and applied to the purposes for which the same were intended. All these were matters within the scope of the secretary's duties, and which, according to established usage, belonged to him to perform. He was therefore intrusted with them, and it was in these alone ·he betrayed his trust. How, then, can the president and directors be liable for the act of embezzlement or forgery merely? There was no collusion, and, thus far, no want of care or prudence on their part. I know of no law which requires the president or directors of any moneyed institution to adopt a system of espionage in relation to their secretary or cashier or any subordinate agent or to set a watch upon all their actions. While engaged in the performance of the general duties of their station, they must be supposed to act honestly until the contrary appears; and the law does not require their employers to entertain jealousies and suspicions without some apparent reason. Should any circumstance transpire to awaken a just suspicion of their want of integrity and it be suffered to pass unheeded, a different rule would prevail if a loss ensued. But, without some fault on the part of the directors, amounting either to negligence or fraud, they cannot be liable."

Whatever irregularities Dresser had been guilty of prior to this time, none of them involved any personal dishonesty. Wherein he had acted contrary to law or prudence was for the supposed benefit of the Trust Company of which he was president. None of his acts had given cause to any of the directors to suspect that he would purposely appropriate to himself any sum whatever. It was discovered some time in October, while Dresser was in Europe. It does not appear what this was taken for. It must be deemed in the nature of a misappropriation by Dresser, although there must have been some purpose which caused its taking to be condoned by the stockholders of the company, who re-elected him thereafter with full knowledge of his act. The only course which the directors could take would be to sue Dresser therefor. But before he returned and could be sued Gould had resigned as director, and after he returned Satterlee both advised its suit and sought to compel his resignation, in both of which he was overruled by the directors. There certainly can be no negligence in permitting the misappropriation, which was done without their knowledge or consent. There can be no negligence in Gould, because of his resignation before the return of Dresser, when suit could have been brought. The diligence of Satterlee was attested by his effort to have the liability sued upon, and by his effort to have Dresser ousted from the presidency. So for that loss I do not find any ground for liability of either of these defendants. These views lead to a reversal of this judgment as to defendants appellant upon law and fact and the granting of a new trial, with costs to each appellant to abide the event of the action, which judgment I recommend.

Judgment reversed on law and facts, and new trial granted, with costs to each appellant· to abide event of the action. All concur,— BETTS, J., in the result—except KELLOGG, J., who writes for modification and affirmance.

JOHN M. KELLOGG, J. (dissenting). A brief statement of some of the facts relating to this Trust Company, the manner in which it

· did business, and the connection of the defendants therewith, makes unnecessary a discussion of the liability in ordinary cases of a director of a trust company for negligence in the performance of his duties. We may assume that he is at least charged with exercising the same care which the ordinarily prudent man would exercise under like circumstances, and that each director is liable only for his own negligence, and not for the negligence of a fellow director.

This company began business March 31, 1902, and about the 1st of October, 1902, was discovered to be upon the brink of ruin by reason of the illegal and reckless manner in which its business had been transacted.

The defendant Satterlee states his introduction into the business as follows:

"Dresser told me that he had heard of this whole matter from Mr. Greig, and they had started to get up a trust company, and some Texas parties were interested and had an option I think or a claim to subscribe to a considerable portion of this trust company stock. * * * He wanted me to become interested in it with him as his counsel, and to guide him particularly at that time in the relations of Mr. Greig and himself with the Texas people, who had been in the matter from its inception and who wanted to get an increasingly large share and take an increasingly prominent part in the transaction."

Dresser had no knowledge or experience in financial institutions, nor does it appear that any of the officers or any one of the other six members of the executive committee had any practical experience as executive or financial men in any moneyed institution.

The by-laws provided:

"That the affairs of the company shall be managed and its corporate powers exercised by a board of twenty-five directors."

And also:

"The executive committee shall exercise all the powers of the board of directors, when the board is not in session, except the power to fill a vacancy in the board. The assent of the executive committee shall be required for all investments that shall be made of the funds of the company in stocks, personal securities and bonds and mortgages, and for the disposal of the same, and of the funds of all special trusts; and no guardianship, receivership, or other special trusts shall be accepted by the president without either their approbation and concurrence or that of the board of directors, unless it be ordered by a court or surrogate having jurisdiction. The executive committee may, in its discretion, authorize the president generally to make investments in such securities as are authorized by the charter of the company, and to dispose of such securities without previously consulting as to details, with the committee; but all such transactions shall be reported to the committee at its next meeting."

Satterlee, at the request of Dresser, purchased 10 shares of stock to qualify as a director and become a director, a member of the executive committee, and counsel for the company; his law firm being designated as official counsel. The defendant Gould also became a director at the request of Dresser, but with the distinct understanding that he was to pay no attention to the affairs of the company or attend the board meetings, and all he did as a director was to qualify and later to resign. This committee was to meet weekly and subject to call by

the president, and was required to keep minutes which were to be read at each monthly meeting of the directors.

The limitations imposed upon a trust company are well considered in Gause v. Commonwealth Trust Company of New York, 196 N. Y. 134, 89 N. E. 476, 24 L. R. A. (N. S.) 967.

The executive committee held its meetings weekly until July 22, 1902. The next meeting was September 9th, at which Whitmore, Greig, and Dresser only were present, and the only business done was adopting a resolution authorizing the president to make or guarantee loans in the company's name when necessary. The object of this resolution was to permit the Trust Company to guarantee the loans of Dresser and Nixon hereafter referred to, which were made in order to float the Shipbuilding scheme. Although regular notices for committee meetings were sent out weekly, the members did not attend.

A proper banking practice required the submission of all loans to the executive committee for its approval at the next meeting following the loan, and this practice was not followed. On May 27th the committee instructed the secretary to present to it at every meeting a complete list of all loans and collateral not previously passed upon, and to merge the reports of both of its offices in one. Apparently the first report of loans was made to the committee on June 17th when the minutes show the loans from the beginning were submitted and approved. The next was on July 8th. Satterlee, though present at both these meetings, apparently gave no attention to or took any interest in the reports and was negligent in not understanding the details of loans made prior to that time.

Immediately after the business was organized, questionable transactions took place, and it became early apparent that the president did not understand the law of banking, or that, if he did, he had no regard for the law. From April 11th, until the crisis, the company was buying and selling its own stock through brokers and otherwise, the amounts paid appearing upon the books as advances, and, when the first semiannual statement was required about June 30th, the president gave his check for the amount and the account was canceled. There were no funds to pay the check, and it remained in the cash items. Afterward the amount was returned to advances. There was no loss; in fact, the company made a profit by these illegal transactions.

On June 23d $700 was loaned to J. W. Young on collateral which was merely an agreement to transfer to the company certain stock in a company thereafter to be formed. On June 24th $5,000 was loaned to Young, a man of little financial and personal standing, secured by an order on Louis Nixon for Shipbuilding bonds, not then issued, of a company which had at that time no property. On June 12th, on similar security, it loaned him $2,500 while he was not in this country. On June 30th $800,000 was loaned for 30 days to a firm on Shipbuilding bonds. This was an excessive loan prohibited by the banking law; the capital and surplus of the company being $1,500,-000. On June 26th $50,000 was loaned to Reiss, Dresser's partner, for which, on October 27th, the note of Engel, an employé of the firm, was taken, secured by Shipbuilding collateral. No actual loss

was sustained on the above loans. They are mentioned as tending to show how and by whom the affairs of the company were conducted.

The losses to the company came from its participation in underwriting the bonds of the United States Shipbuilding Company, of which Dresser was vice president and director. Briefly, the Shipbuilding Company's scheme was to purchase the plants of certain other companies, payment for which was to be made at the Trust Company on August 11th. It involved the underwriting of $9,000,000 of bonds at 90, with bonuses of 25 per cent. of preferred and 25 per cent. of common stock. The property so acquired was to be the security for the bonds, which were to be issued after August 11th, when the Shipbuilding Company should have acquired title to the mortgaged property. Dresser and probably the other directors had no confidence in the character or financial standing of Young, the promoter of the Shipbuilding Company, and at first Dresser refused to meet him, but finally did so at the request of another Trust Company and its counsel, who also were interested with Young in the formation of the Shipbuilding Company. Dresser was led to believe that one-third of the underwriting had been subscribed in Paris, one-third in London, and the other one-third was to be underwritten in New York.

He undertook to obtain the $3,000,000 subscription allotted to New York. If he succeeded, his company was to be bankers for the Shipbuilding Company and otherwise act for it, and was to receive the compensation mentioned hereafter. If he did not succeed, his company was to receive nothing and was not otherwise to act for it. A prospectus of the Shipbuilding Company was issued which named the Trust Company of the Republic as the party to receive applications for bonds, and gave notice that said Trust Company would open subscription books for public subscription, and reserved to the Trust Company the right to give preferential allotments to the shipbuilding trade and its employés. Dresser secured the subscriptions to the underwriting as agreed, and, when he learned that the London underwriting had failed, he agreed with the promoter and the representative of the other Trust Company that he would do all he could to obtain $1,700,000 of that underwriting, with the understanding that the remainder of the amount allotted to London would be arranged for with the Paris underwriting. With some help from his executive committee and directors, he secured his share of the London subscription, in a large part from his own directors and officials, and thereafter, from June 14th to June 19th, the Trust Company advertised the bonds in the New York papers for public sale at 97½. The advertisement recited that the Trust Company was authorized to receive subscriptions, that the entire issue of $9,000,000 had been underwritten, and that "the Trust Company of the Republic reserves the right to close the subscription at any time and to reject any and all subscriptions." Notwithstanding this advertisement, it was not then definitely known that the balance of the London subscription would actually be taken in Paris, and the real status of the Paris subscription was not understood. The Trust Company actually received $476,755 from the public sale, and Dresser had obtained subscriptions for $4,-700,000 of bonds.

As August 11th, the date for payment, approached, it was understood there would be delay in receiving the money from the Paris underwriters; but it was hoped that it would eventually be realized. If the underwriting failed, the Trust Company would lose its compensation and would lose the Shipbuilding Company's accounts, it would be discredited, the loans which it had made, secured by the Shipbuilding underwriting, would be uncovered, and the persons who had purchased bonds from the company could not receive them. The company had made itself so far a part of the scheme that its failure meant an irreparable injury. The situation was met by an excessive and illegal loan by the Trust Company to Nixon upon the security of the Shipbuilding bonds, and loans of large amounts were obtained by Dresser and Nixon elsewhere by pledging the Shipbuilding bonds and upon the Trust Company guaranteeing them.

The defendant Satterlee went abroad on his vacation July 16th and returned September 29th. Soon after he returned, he discovered the large loan made to Nixon and the large guaranties made by the company. He and others became alarmed, and undoubtedly his able and effective management, with the assistance of his friends, saved the Trust Company from failure. By the formation of a syndicate which, in consideration of certain Shipbuilding bonds, settled the Nixon and Dresser notes and the company's guaranty, it resulted that the company sustained no loss therefrom.

The evidence of Dresser indicates that he was acting in the Shipbuilding underwriting for the Trust Company and not for himself, and that up to the time that Satterlee went abroad the executive committee was informed by him in a general way what was being done in the matter. In the minutes of the committee appears May 20th: "The President made an informal report on the Shipbuilding Combine." May 27th: "The Shipbuilding underwriting proposition was discussed." At this latter meeting he stated what was desired of the company and the benefits which would come to it. It is significant that the first record shows an informal report on the combine; the next the underwriting proposition was discussed. On May 27th, on the stationery of the company, we find a communication to Dresser from his vice president, stating the understanding between him and the representatives of the other Trust Company that the latter was to act as trustee for the bonds, etc., and the Trust Company of the Republic to act (a) as issuing bankers and perform all the duties incidental thereto, (b) advertise prospectus, (c) receive all subscriptions, (d) pay the necessary cash to the trustees to check the titles and commitments thereto, (e) deliver all bonds and shares to the subscribers, (f) registrar and transfer agent of the shares of the company, and concluded by asking his opinion as to what price the public issue should be made, how long they should be advertised before the books were opened, and how long the books should remain open. The defendant Satterlee does not remember this communication; but there was no other Shipbuilding proposition up for consideration, and I am satisfied that Dresser read or stated the contents of this memorandum at this meeting in the defendant's presence. The min-

utes of June 4th show: "President made a verbal report on the United States Shipbuilding underwriting." The evidence shows that the general progress of the underwriting was stated. June 23d the promoter, Young, gave to Nixon an order, which was accepted by him, to deliver to the Trust Company, "in payment for services rendered and to be rendered in the matter of the underwriting and issue of nine million dollars of the bonds," $300,000 of bonds, $800,000 of the preferred stock, and $800,000 of the common stock, "the same being payable to them in accordance with my letters of agreement which they hold." It also authorized the company to retain $67,000 in cash as it was received by it. It also recited that the Trust Company is to receive from the proceeds of the sale of the Bethlehem Steel Company $1,000,000 of the common stock of the Shipbuilding Company. Dresser was an active participant in getting the Bethlehem Steel Company into the combination and was to receive $1,000,000 of the common stock for his services, which I assume is the last item mentioned. The letters referred to in the order are not in evidence, but were evidently written before the underwriting was completed and prior to June 14th. Dresser prided himself on this accomplishment, and there is no doubt that he informed the executive committee. Sattarlee swears:

"When I saw the advertisement I knew that this transaction involved the raising of several millions of dollars. I knew that before the advertisement, but I did not know the full volume. I was told by Dresser—that is, I heard a statement he made at the meeting of May 27th of the executive committee in which it appeared that there were to be several millions of bonds and several millions of stock—but I did not know the exact amount until I saw the advertisement. I knew that the putting through of that transaction ought to involve the supervision of counsel at practically every step. I do not think I made any investigation of the details of the transaction before I went away. I had no conversation with either of the members of the firm of Ward, Hayden & Satterlee with respect to overseeing the legal side of the transaction."

On July 12th, just before sailing, he wrote Dresser:

"Let me again congratulate you upon the splendid success you are making. You have already exceeded the confident expectations of your friends and have made a record for the company that I believe is unique. My only word of caution would be to 'go slow' and take it as easily as possible during the summer and not overwork yourself, as we ought to have a very busy and prosperous winter ahead of us." ·

From his testimony it does not appear that he had much knowledge of the affairs of the company, and it does not indicate that he knew of anything which would justify him in characterizing the success of the company as unique except the large benefit it expected from this underwriting. He admits that Dresser stated at an executive committee meeting that the company would receive its compensation within the month and it would go into the next report. If none of the committee knew what compensation the company was to receive, it is strange that inquiry was not then made. The company had not otherwise earned anything; its service as banker had not begun.

It is not contended that under ordinary circumstances a director or a member of an executive committee of a trust company, who is absent from meetings for a reasonable time upon his own busi-

ness or pleasure, is liable on account of transactions which took place in his absence and of which he had no notice. By becoming such officer a person does not undertake to devote his whole time to the company. The members of the executive committee received $10 for each meeting, and necessarily it was expected that they were at liberty to devote their time to their ordinary business and pursuits, giving to the Trust Company just such time as was reasonably necessary under the circumstances to protect its interests. When the defendant Satterlee left New York on his vacation July 16th to return September 25th, he knew that two of the members of the executive committee were practically of no use; that the other members were exercising very little supervision and taking but little interest in the matters; that they were practically permitting Dresser to carry on the business in his own way; that the company was involved in the Shipbuilding underwriting and had gone so far with reference to it that a failure of the plan meant practical disaster. It was too late to leave without obtaining a thorough and accurate knowledge of the circumstances and details of the underwriting and taking some · precautionary measures against contingencies. He had made no inquiry and had no knowledge as to the Paris underwriting or as to the American underwriting and had no information of the trustworthiness of any of the subscriptions. The trouble came to the company from the fact that Dresser received his information from the hearsay of parties whose interests were opposed to his, and that the executive committee made no inquiry and sought no information with reference to the plan or its execution, but was content with the hearsay from Dresser to the extent which he chose to communicate. It is not necessary to say that the participation of the Trust Company in this underwriting was illegal. Gause v. Commonwealth Trust Co., 196 N. Y. 134, 89 N. E. 476, 24 L. R. A. (N. S.) 967. It is enough to say that under the circumstances it was reckless. The defendant was negligent while here and negligent in leaving while the affairs of the company, by reason of its reckless management, were in such a serious condition.

It is unnecessary to inquire whether Dresser and the directors and executive committee, who acted in part with him during Satterlee's absence, took a wise or unwise course to relieve the company from the emergency in which it had previously been placed. He evidently did what he thought best. Many of his acts were illegal and unauthorized; but it was represented to him that there was simply a delay in the money from Paris, and he felt that the expedients which he adopted were mere makeshifts to tide over a few days. The persons who negligently permitted the Trust Company to get involved in this matter under the circumstances are hardly in a position to complain because Dresser acted unwisely or illegally, or to deny that their negligence makes them civilly responsible for such acts.

The defendant Gould agreed to be and was a dummy director. If the others had followed his example, Dresser would have been the board of directors and the executive committee. Gould left everything to his discretion and judgment and is fairly responsible for it.

It is immaterial in each particular transaction to consider whether the directors and members of the executive committee knew what was being done by the company or whether their fault lay in not knowing. The method in which the executive committee permitted the business to be carried on by Dresser evidently led the officers and employés of the company to understand that Dresser was in fact the executive committee and that he was unrestrained in doing what he thought ought to be done.

About September 25th Dresser deemed it necessary to go to Paris to try and realize upon the underwriting there, and just before he departed he took from the company, with the consent of the vice president and the clerk who had charge of issuing checks, $35,000. Their acts can only be explained upon the supposition that they felt it was money taken to be used in the company's business with reference to the Paris underwriting. Apparently it was not so used. When he arrived at Paris he did not find any substantial underwriting there, and the alleged Paris underwriting did not justify any expenditure. This money was never repaid to the company and is one of the items of damages which have been allowed against the defendants. In my judgment it was properly allowed.

When Dresser was obtaining the part of the so-called London underwriting which fell to him, the day when the underwriting must be closed was at hand and the subscriptions not entirely taken, and he called upon members of the executive committee to assist him. One of the last subscriptions obtained was that of Bruckman, who later gave his notes for a part of his underwriting, secured by the underwriting agreement or the bonds called for by it. After the syndicate had relieved the company, Bruckman refused to pay his notes, claiming that he had been deceived. An adjustment was made after Gould had resigned as a director and Satterlee as a director and member of the executive committee. The agreement of adjustment recited:

"That Bruckman agreed to underwrite and purchase the securities subject to a loan of $249,200, with interest at five per cent., for the repayment of which loan he was not to become personally liable, the Trust Company to look to the securities only for the eventual payment thereof."

The Trust Company then accepted the bonds and relieved him from liability upon his notes. Satterlee was attorney for the company in making the adjustment and approved of and advised the execution of this agreement. We cannot assume that the recital was false. It related to the terms of a subscription taken by the company while he was a member of its executive committee. It is therefore some evidence against him that the Bruckman note never had any validity and that the company was negligent in advancing money upon it. Bruckman all the while was financially responsible, and, aside from this recital in the agreement, there is no evidence giving any good reason why his note was not collectible. This recital is not evidence against the defendant Gould.

With reference to the other notes which have been treated as an element of damage, while the makers were discharged, there is no evidence tending to show that there was any valid reason therefor.

These conclusions lead to the result that the judgment should be modified as to the defendant Gould by striking out all damages except with reference to the $35,000 item, and as to the defendant Satterlee by striking out all damages except those relating to the $35,000 item and the Bruckman notes, and as so modified affirmed, without costs.